

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*Shawn P. Barnes and Lauren E. Repole*　　　　970 Broad Street, 7th floor　　　　973-645-2700
*Assistant United States Attorneys*　　　　　　Newark, New Jersey 07102

March 22, 2023

Honorable Edward S. Kiel
United States Magistrate Judge
United States Post Office and Federal Courthouse
2 Federal Square
Newark, New Jersey 07102

　　　　Re:　United States v. Peter Coker, Jr.
　　　　　　 Crim. No. 22-643 (CPO)

Dear Judge Kiel:

　　A bail review hearing in the above-captioned matter is scheduled to proceed before Your Honor on **March 23, 2023 at 2:30 p.m.** Please accept this letter brief in lieu of a more formal response in opposition to Defendant Peter Coker, Jr.'s application for pretrial release.

　　No evidence is more telling than a defendant's own words – such is the case here. When the Defendant renounced his United States citizenship on June 5, 2019, he stated:

> While I was born and raised in the U.S., I moved to Hong Kong in July, 1992 for career reasons and have established my roots and extensive social and family ties here. I have no intention to return to live or work in the U.S., and have therefore decided to renounce my U.S. nationality.

Gov. Ex. A, p. 5. With the Defendant's statements in mind, and in light of all the other pertinent facts outlined herein, the Government respectfully submits that the Defendant poses a serious risk of flight, and that there are no conditions or combination thereof that can assure his appearance at future proceedings. The Government further submits that, even if the Court finds that some set of conditions could provide such assurances, the Defendant has not provided such a package and thus, the Defendant's request for bail should be denied.

## Procedural Background

On September 26, 2022, the Defendant was charged by way of Indictment with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371 (Count One), securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Two), and conspiracy to manipulate securities, contrary to Title 15, United States Code, Sections 78i(a)(2) and 78ff, and Title 18, United States Code, Section 2, in violation of Title 18, United States Code, Section 371 (Count Three).

At the request of the United States, on or about January 11, 2023, the Defendant was arrested on a provisional arrest warrant in Phuket, Thailand, pending extradition to the United States. The Defendant was returned to the United States, in law enforcement custody, on March 15, 2023. On that date, the Defendant appeared before the Honorable Michael A. Hammer, United States Magistrate Judge, for an initial appearance and arraignment, at which time he consented to detention pending submission of a bail package.

## Relevant Facts

In 2014, Individual-1 and Individual-2 began the process of opening a local deli (the "Deli"). Co-defendant James Patten, a long-term friend of Individual-1, offered to assist by incorporating the deli so that Individual-1 and Individual-2 could potentially expand. The Deli was opened under the name "Your Hometown Deli" on October 14, 2015—the Deli was opened under the umbrella corporation Hometown International ("Hometown"), of which it was a wholly owned subsidiary. Patten encouraged and instructed Individual-2 and Individual-1 to create the umbrella corporation.

Individual-1 and Individual-2 managed the day-to-day operations of the Deli, which never made much money and ultimately operated at a loss. Initially, Individual-1 was listed as the president of Hometown and Individual-2 the vice-president, but the investigation revealed that they were mere nominee officers. Patten, serving as an unnamed control person, was primarily responsible for Hometown's operations and directed Individual-1 and Individual-2 with respect to any efforts necessary for Hometown's corporate actions. Patten worked alongside, and in concert with, two associates during the scheme—Peter Coker, Sr., with whom Patten worked at Tryon Capital in Chapel Hill, North Carolina, and his son, the Defendant, Peter Coker, Jr.

The investigation revealed that Patten, Coker, Sr., Coker, Jr., and others orchestrated a market manipulation scheme to artificially increase the stock price of Hometown (and another shell company, E-Waste, discussed below) in an effort to market the shell company at an artificially high price for international buyers

seeking to take a private company public on the United States markets. They were able to execute this scheme by coordinated trading among a small group through a combination of wash and match trading. They were successful in artificially inflating Hometown's share price. On the first day of trading, October 25, 2019, Hometown's closing price was approximately $1.25. On April 16, 2021, Hometown closed at approximately $12.99 per share (a net price increase of approximately $11.74), representing an approximate 939% increase from the first trading day.

Almost immediately after Hometown's creation, Patten and Coker, Sr. arranged the sale and/or gifting of Hometown shares to a number of their family members and close associates. The "OTC Link Alternative Trading System" is an alternative trading system, or "ACS," that contains three tiers of markets, which are largely based on the quality and quantity of the listed companies' information and disclosures. "OTC Pink" is the lowest tier, and most speculative of the marketplaces. "OTCQB" is the middle tier, which requires that listed companies meet certain eligibility standards. "OTCQX" is the top tier of the three marketplaces and requires that listed companies meet more stringent eligibility requirements (altogether, the "OTC Marketplace"). Patten, Coker, Sr., and Coker, Jr. disseminated Hometown shares in an effort to get the stock publicly listed, as the OTC Marketplace requires a certain number of shareholders. In October 2019, Hometown began trading on the OTC Pink Market, a lesser-regulated, more decentralized market for trading.

Additionally, as part of the scheme, Patten, Coker, Sr., and Coker, Jr. facilitated the transfer of a majority share of Hometown stock from Individual-1 and Individual-2 to foreign entities that were surreptitiously controlled by Coker, Jr. at a nominal rate. Once in Coker, Jr.'s hands, the value of these shares was artificially inflated through the above market manipulation scheme. More specifically, in December 2019, Patten, Coker, Sr., and Coker, Jr. facilitated the sale of two million shares held by Individual-1 and Individual-2 (constituting 38% of the outstanding stock) to COKER, JR. for $3,000. In February 2020, Patten orchestrated the sale of an option to purchase Individual-2's remaining 1.5 million shares (28% of the outstanding stock) to COKER, JR. for $500.

"Coordinated Trading Events" or "CTEs" are trading events, such as match trades and wash trades, that are used to create the appearance that a given stock price rose as a result of genuine market demand for the respective security. Patten, Coker, Sr., and Coker, Jr. facilitated the artificial inflation of Hometown's stock through match and wash trading and attempted to use Hometown as a vehicle to acquire another entity through a reverse merger in order to ultimately sell their shares at an artificially inflated price.

Patten, Coker, Sr., and Coker, Jr. also orchestrated the execution of consulting agreements between Hometown and their respective firms and entities under their control. The consulting agreements were arranged by Patten, who

signed Individual-1's name on the Form 8-K, the form used to notify investors of significant or important events, announcing the arrangements. In total, Hometown paid consulting agreements in the amounts of $15,000 per month to Coker, Sr. through Tryon Capital, and $25,000 per month to Coker, Jr. through VCH Limited a Macau entity.

Coker, Jr. became Hometown's Chairman of the Board in February 2020. In March 2020, Coker, Jr. exercised the option to purchase Individual-2's shares. During the following month, Patten, Coker, Sr., and Coker, Jr. transferred all 3.5 million of these shares to four nominee entities located in Macau, China, all of which were controlled by Coker, Jr. More specifically: on April 6, 2020, Coker, Jr. "sold" 2 million shares for $.0015 per share to Global Equity Limited; and on April 15, 2020, Coker, Jr. "sold" the remaining 1.5 million shares for $.0015 per share to VCH Limited, IPC-Trading Company, and RTO Limited. Based on emails obtained as part of the investigation, these nominee entities are controlled by Coker, Jr.

In March 2020, Hometown issued 100,000 shares of common stock to Europa Capital Investments, LLC—an entity controlled by Coker, Sr. and another co-conspirator ("Co-Conspirator-1")—in exchange for approximately $144,000 in debt owed by Hometown to Europa Capital. Approximately two months later, Europa "gifted" 100-500 block shares to approximately 21 individuals, nearly all of whom have a relationship with Patten, Coker, Sr., or Co-Conspirator-1.

The targets spread out the stock for three primary reasons: 1) to give regulators and the marketplace the impression that there were more investors than there actually were; 2) to put shares in the hands of friends and associates in order to facilitate CTEs; and 3) to give the false impression of an arm's-length relationship between themselves and the shareholders. These motivations became critical when the co-conspirators "uplisted" Hometown to a more desirable OTC Marketplace tier.

In June 2020, Hometown filed a Form S-1 Registration Statement (the "Form S-1") in order to register 2.7 million shares with the Securities and Exchange Commission ("SEC"). Despite the fact that these 2.7 million shares included shares owned by Coker, Jr.'s nominee entities, Coker, Sr., Europa Capital, and at least seventeen individuals who were either related to or associated with Patten, Coker, Sr., and Coker, Jr., the Form S-1 stated "[n]one of the Selling Shareholders nor any of their respective affiliates have held a position or office, or had any other material relationship, with us or any of our predecessors or affiliates."

The registration of the 2.7 million shares allowed Hometown to be uplisted from the OTC Pink to the OTCQB market. This elevation was beneficial in that: 1) it provided fewer obstacles to trading; 2) it provided higher visibility for Hometown; 3) it allowed shareholders to sell their shares at a price higher than $6.50 per share,

the amount at which it had previously been capped; and 4) it provided a level of legitimacy to Hometown, which was beneficial in the quest for a reverse merger.

In April 2020, Patten, Coker, Sr., and Coker, Jr. arranged a private placement of 2.5 million shares to three accredited investors for gross cash proceeds of $2.5 million. The funds were transferred into the Hometown International checking account, to which Patten had access. In the weeks following the transfer, Patten transferred more than $291,000 to Coker, Sr.'s personal account, over $47,000 to Europa Capital, over $95,000 to Tryon Capital, and $100,000 to VCH Limited.

In May 2020, Hometown entered into consulting agreements with Tryon Capital (controlled by Coker, Sr. and Co-Conspirator-1 and also associated with Patten) and VCH Limited (one of Coker, Jr.'s nominee entities). As noted, bank records show that Hometown funneled $15,000 per month to Coker, Sr. through Tryon Capital, and $25,000 per month to COKER, JR. through VCH Limited. According to Individual-1, Patten instructed him to wire money to VCH Limited.

Patten, Coker, Sr., and Coker, Jr. also orchestrated the artificial inflation of Hometown's stock price through manipulative trading (or CTEs). They accomplished this by coordinating match and wash trades with nominee accounts over which they had control and other associates. Patten used the brokerage accounts of numerous friends and associates (which had been listed in the Form S-1); Coker, Sr. traded in his own brokerage account, as well as his wife's; and Coker, Jr. arranged for an associate ("Co-Conspirator-2") to set up a brokerage account, which was also used to commit CTEs with the Coker, Sr. and Patten-controlled accounts.

Between May 8, 2020 and April 15, 2021, the manipulative trading that Patten, Coker, Jr. and Coker, Sr. orchestrated resulted in an increase of Hometown's stock value from $6.00 per share to $13.90 per share. Patten kept track of all of the trades by receiving reports on a weekly basis and reporting back to Coker, Jr. and Coker, Sr.

The scheme involving E-Waste, Corp. ("E-Waste") was similar to the scheme involving Hometown. E-Waste was a publicly traded, albeit failing, company. In September 2020, Patten approached another long-time friend ("Individual-3") about assisting E-Waste with a reverse merger. Shortly thereafter, Individual-3 was appointed CEO of E-Waste, although Patten was effectively in control and made substantive decisions on behalf of the company.

Over the following weeks, the targets orchestrated the transfer of millions of E-Waste shares into their own names and the names of the same nominee entities and engaged in a series of CTEs. Patten, Coker, Sr., and Coker, Jr. then sought to profit from E-Waste by entering into consulting agreements, arranging a private

placement of stock, and by inflating E-Waste's stock price. Between July 2020 and April 2021, Patten, Coker, Sr., and Coker, Jr. orchestrated a number of match and wash trades, which ultimately had the impact of raising E-Waste's stock price from $.10 per share to $10.00 per share. Emails from Patten, Coker, Sr., and Coker, Jr., along with IP records, support the market manipulation theory related to E-Waste.

On April 16, 2021, multiple news articles were published that questioned the validity/legality of Hometown and E-Waste's inflated stock prices.

In September 2021, E-Waste merged with EZRaider Global, Inc. A registration statement has not yet been filed—the co-conspirators have not yet sold their shares of E-Waste.

On March 31, 2022, Hometown announced that it had entered into a reverse merger with Makamer Holdings, Inc. Hometown's application to FINRA for a ticker symbol change remains pending—the co-conspirators have not yet sold their shares.

## **Argument**

### The Relevant Legal Standard

Pre-trial release and detention are governed by the Bail Reform Act of 1984, codified in 18 U.S.C. §§ 3141–56. Section 3142(f)(2) provides that the Government may seek to detain a defendant pending trial in situations where, as here, the Government establishes by a preponderance of the evidence that there is a "serious risk that [the defendant] will flee." The burden of proof that the Government must meet – preponderance of the evidence – requires the Government to establish that there is a greater than 50% probability that the claim is correct. As outlined in Section 3142(e), a defendant should be detained where, "after a hearing . . . the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required . . ." Section 3142(g), in turn, provides several factors that this Court must consider in making that determination, including "the nature and circumstances of the offense charged," "the weight of the evidence against the person," "the history and characteristics" of the defendant, including:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." These factors weigh decisively in favor of Defendant's continued detention.

## Analysis of the Section 3142 Factors

**The Nature and Circumstances of the Offense.** Regarding the nature and circumstances of the offense, as outlined above, the Defendant engaged in a long-term, complex fraud scheme that relied upon shell corporations, straw stock-holders, false filings, and manipulative stock trading to create an illusion of a corporate entity with genuine market interest; without this, the fraud could not succeed. Moreover, the Defendant was a critical participant in the scheme – without his international business knowledge, connections, and skills, the scheme would not have worked.

Once the Defendant and his co-conspirators took Hometown public, the Defendant, through his shell corporations, took control of a majority of the stock. The defendant and his co-conspirators masked their ownership interest in Hometown in order to give the false impression of an arms-length relationship, when in reality, they controlled every aspect of the corporation.

The Defendant and his co-conspirators spread nominal shares of Hometown stock around their friends, associates and family members – including the Defendant's sister, whose home is now being offered as part of the Defendant's proposed bail package, as well as the Defendant's niece and nephew. The Defendant and his co-conspirators did not spread the stock around as an "investment opportunity," of sorts; rather, they spread the stock in order to give the appearance of genuine investor interest and broaden their investor base in order to up-list Hometown to a more desirable market. And despite the fact that Coker, Jr.'s shell companies, located in Macau, China, held 2.7 million Hometown shares, the Defendant and his co-conspirators filed a fraudulent S-1 Form with the SEC certifying that "none of the selling shareholders nor any of their respective affiliates had any material relationship with us or any of our predecessors or affiliates."

And then, they began engaging in illegal manipulative trading, such as match trades and wash trades, in order to artificially inflate the price of Hometown's stock. Indeed, over approximately eighteen months, the Defendant and his co-conspirators manipulated the price of Hometown's stock for an increase of approximately 939 percent – that is, from $1.25 per share to $12.99 per share. This Defendant then arranged for a private placement of Hometown shares with a foreign business in exchange for $2.5 million, which the Defendant and his co-conspirators used to pay themselves exorbitant consulting fees totaling over $800,000. And the only reason that the Defendant and his co-conspirators were unable to achieve their ultimate objective of entering into a reverse merger, which

would have allowed for a massive payout, was because of negative news articles that exposed their fraud.

This scheme was not just a simple "pump and dump" scheme. This was a complex fraud that took years to develop – indeed, by his own words, the Defendant stated "WE HAVE CURATED HOMETOWN FROM DAY 1 . . ITS BEEN AROUND FOR 6 YEARS OR SO." See Gov. Ex. B. In reality, the Defendant and his co-conspirators' scheme was a complex, long-term fraud, running at least seven years, that was geared towards a reverse merger, not merely "dumping" their overinflated shares back onto the market.

The nature and circumstances of this offense are very serious in that the offense involved an intricate, international scheme that was reliant on multiple deceptive practices.

**The Weight of the Evidence is Strong.** As outlined herein, the evidence against the Defendant is overwhelming. The Defendant took control of a majority position of Hometown's stock and then placed it with shell corporations that he controlled – a fact that is corroborated by the Defendant's own email communications. In those same email communications, the Defendant: 1) arranged business transactions, 2) liaised between foreign investors and his co-conspirators and 3) facilitated communications with Co-Conspirator-2, an overseas "investor" who played a significant role in the match trades and wash trades that fraudulently drove up Hometown's value. Indeed, when introducing Co-Conspirator-2, the Defendant stated "LETS TRY TO KEEP THE EXPOSURE ONLY AT WHAT WE NEED I DON'T WANT TO BURN HIM OUT SO ORDERS OF 100-200-300 DAILY IS DO-ABLE . ."

**The Maximum Penalties (and the Guidelines) are High.** The defense understates the Guidelines calculations in this case. The Government certainly acknowledges the impact of United States v. Banks, 55 F. 4th 246 (3d Cir. 2022) – but the defense ignores the over $800,000 in consulting fees that he and his co-conspirators were paid by Hometown for their no-show jobs. By the Government's calculations, Count Two (securities fraud), carries:

- A base offense level of 7 (U.S.S.G. § 2B1.1(a)(1));

- A 14-level enhancement because the loss amount exceeds $550,000 (U.S.S.G. § 2B1.1(b)(1)(H));

- A 2-level enhancement because a substantial part of the fraud occurred outside the United States or the offense involved sophisticated means (U.S.S.G. § 2B1.1(b)(10));

- Resulting in a total offense level of 23, which, when coupled with a criminal history category I, results in an advisory Guidelines range of 46-57 months, and squarely falls within Zone D of the Sentencing table.

Moreover, the Defense fails to acknowledge the possibility of any upward departures based on an inadequacy in loss amount.

The statutory maximum penalties are significant as well – Counts One and Three carry five-year maximum terms and Count Two carries a twenty-year maximum term.

Thus, the Defendant faces significant penalties. The likelihood that he would exceed his term of imprisonment – particularly in light of his current 7 days of jail credit – is simply not an issue at this point.

**The Use of Aliases.** The Government does not have any information regarding the Defendant's use of actual aliases, but on this point, we note that the Defendant created at least four foreign shell corporations, based in Macau, China, that he used to mask his ownership interest – more specifically – to mask his position as a majority shareholder in Hometown. And, the Government is in possession of emails that the Defendant sent discussing the need to put shares in other company's names to avoid appearing too "close." So, while Coker, Jr. has never utilized an alias to mask his personal identity, he certainly has utilized shell corporations to mask his identity as a majority shareholder in order to further this fraud. Moreover, as described above, the Defendant used countless nominees as straw stock holders to facilitate the scheme.

**The Defendant's Ties to Foreign Countries.** The Government certainly acknowledges that the Defendant has family members in the United States. But this fact did not stop him from formally renouncing his citizenship in 2019. And again, the Defendant's own words regarding his renunciation are telling:

> While I was born and raised in the U.S., I moved to Hong Kong in July, 1992 for career reasons and have established my roots and <u>extensive</u> social and family ties here. I have no intention to return to live or work in the U.S., and have therefore decided to renounce my U.S. nationality.

Gov. Ex. A, p. 5 (emphasis added). And despite the family ties that the Defendant now claims assure his appearance, he left the United States over thirty years ago and has been living abroad ever since.

Additionally, the Defendant has no financial ties to the District of New Jersey. He does, however, have extensive ties to executives with access to large amounts of money outside the United States. Indeed, the Defendant's foreign ties are among the most significant factors here. The Defendant renounced his United

States citizenship, and obtained citizenship in St. Kitts, which he used to enter Hong Kong and Thailand. He established significant business connections in both countries – indeed, the Defendant participated in the instant offense while in Hong Kong and he used his knowledge of multiple Hong Kong businesses, and his connections to business executives to commit this offense.

**The Defendant Did Not Return to the United States Voluntarily.** Despite his assertions to the contrary, the Defendant did not return to the United States voluntarily; rather, he was arrested on January 11, 2023, and remained in a Thai jail until he was transferred into the custody of federal agents. The Government acknowledges that the Defendant waived the formal extradition process, but not until he was already in custody. Simply stated, the Defendant did not voluntarily board a flight to answer these charges – he returned to the United States in the custody of federal agents.

And the Defendant's assertion that he could have mounted legal challenges to this case from abroad wholly ignores the fugitive disentitlement doctrine. Indeed, "[i]n Bossert v. Attorney General of U.S. 343 Fed. Appx. 801, 805, n. 2, the Third Circuit noted that 'pursuant to the Fugitive Disentitlement Doctrine, a criminal defendant who has failed to surrender may be barred from calling upon the resources of a court.' citing Molinaro v. New Jersey, 396 U.S. 365 (1970)." United States v. Donahue, 2011 WL 13364481 (M.D. Pa. Jan. 14, 2011) (emphasis added).

The defense argument that Coker, Jr. could have fled to a country that did not have an extradition treaty with the United States is incomplete. Law enforcement received credible information indicating that after he learned of the Indictment, the Defendant actively attempted to determine the type of wants and warrants that were in place. Perhaps the Defendant's decision to remain in Thailand was motivated by concerns of being arrested at the border.

But despite the Defendant's motivations for remaining in Thailand, one salient fact remains: he did not return to the United States of his own volition.

**The Defendant Poses a Significant Flight Risk.** In sum, this is a complex financial crime that was committed by an individual who has significant ties to foreign countries and minimal ties to the United States. The fact that he has renounced his citizenship demonstrates his affirmative intent – by his own words – to live his life elsewhere. Given the penalties he faces – up to 20 years in prison on Count Two – the Defendant has every reason to flee. And given his knowledge of the financial industry and access to large amounts of cash, he certainly has the means to evade prosecution. His utilization of shell corporations to mask his ownership interest demonstrates his willingness to use deceit to flout the law when it is in his financial interest.

For these reasons, the Government respectfully submits that there are no conditions or combination thereof that can reasonably assure the Defendant's appearance at future court proceedings.

<u>The Defendant's Proposed Bail Package is Insufficient, In Any Event</u>

The Defendant's bail package relies on collateral from two parties: his parents and his sister. The Defendant's father is also his co-defendant and was one of his co-conspirators. Notably, the elder Mr. Coker traveled from North Carolina to Camden, New Jersey and appeared before the Honorable Christine P. O'Hearn, United States District Judge, on October 11, 2022 for an arraignment. The Defendant, on the other hand, remained in Thailand, allowing his 80-year-old father to answer for their collective misdeeds. But now, the Defendant asks this Court to credit his assertions that he will not flee because such flight would have a harmful impact on his father.

During the scheme, the Defendant also allowed one of his co-conspirators, James Patten, to use a brokerage account in his sister's name to commit match trades and wash trades – indeed, Coker, Jr.'s sister is referred to as "Individual-5" in the Indictment and the Defendant's criminal conduct utilizing her account appears in Paragraph 4(l)(iii), which states:

> On or about February 22, 2021, at approximately 11:21 a.m., the account registered to Co-Conspirator-2 placed two orders to purchase 100 shares of Hometown International for $13.85 per share from an IP Address associated with COKER, SR. Approximately two hours later, at 11:21 a.m., one order was filled by an account registered to COKER, SR. from an IP Address that resolved to PATTEN'S residence. Shortly thereafter, at approximately 12:07 p.m., the second order was filled by an account registered to Individual-5 from an IP Address that resolved to PATTEN'S residence.

The Defendant also allowed Mr. Patten to use brokerage accounts in the Defendant's nephew's name, who is referred to as "Individual-7" in the Indictment, and the Defendant's niece's name, who is referred to as "Individual-8" in the Indictment. Indeed, the Defendant's criminal conduct utilizing Individual-7's account appears in Paragraph 4(t)(i), which states:

> On or about November 19, 2020 at approximately 11:21 a.m., an account registered to Individual-7 placed an order to buy 100 shares of E-Waste for $2.66 per share from an IP Address that resolved to PATTEN'S residence. Approximately two minutes later, at approximately 11:23

> a.m., the order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

And in Paragraph 4(t)(v), which states:

> On or about April 9, 2021, at approximately 1:27 p.m., an account registered to Individual-7 placed an order to purchase 100 shares of E-Waste for $10.00 per share from an IP Address that resolved to PATTEN'S residence. Approximately ten minutes later, at 1:37 p.m., the order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

And in one instance, the Defendant and his co-conspirators used Individual-7 and Indivdiual-8's accounts in the same wash trade. This particular illegal conduct appears in Paragraph 4(t)(iv), which states:

> On or about March 22, 2021, at approximately 2:17 p.m., an account registered to Individual-7 placed an order to purchase 176 shares of E-Waste for $9.46 per share from an IP Address that resolved to PATTEN'S residence. Approximately two minutes later, at 2:19 p.m., the order was filled by an account registered to Individual-8 from the same IP Address, which, again, resolved to PATTEN'S residence.

The Government points these facts out not to besmirch the Defendant's family, but rather, to demonstrate that the Defendant was willing to use multiple family members' brokerage accounts in furtherance of a massive fraud. More specifically, the Defendant put his family members in the middle of a massive financial fraud because it benefitted him personally. But now, the Defendant asserts that he would not flee because of the negative impact that his conduct would have on his family, including his sister.

      Simply stated, the Defendant's assertions that he would not flee because it would jeopardize his family members' homes is unsupported by the record; in fact, it is actually refuted. Peter Coker, Jr. does what is good for Peter Coker, Jr., even if it means using a family member's account to commit crimes or letting an elderly parent, who is far less culpable than the Defendant, answer for the lion's share of their joint criminal activity.

      And while $1.5 million sounds like a lot of money for an individual to put up for bail – it is a drop in the bucket for this defendant. The Defendant stood to make tens of millions of dollars from the Hometown transaction. Indeed, the Defendant

demonstrated his financial prowess at multiple points in the conspiracy – at one point securing $2.5 million in actual funds from Chinese investors for a company that only had approximately $30,000 in assets.

## Conclusion

As noted herein, the Defendant represents a serious flight risk. He is facing serious charges that involve significant penalties and the evidence him is overwhelming. He has minimal ties to the United States – indeed he has renounced his United States citizenship and has lived abroad for over 30 years. Simply stated, he has every reason to flee. And given his significant ties to foreign nations and his access to large sums of currency, he has all the means necessary to evade this prosecution and live a very comfortable life abroad.

Given the above, the Government respectfully submits that the above reasons establish, far-beyond the requisite preponderance of the evidence standard, that there are no conditions or combination thereof that can reasonably assure the Defendant's appearance. Therefore, the Government respectfully requests that the Court Order the Defendant detained.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

By:   SHAWN P. BARNES
      LAUREN E. REPOLE
      Assistant U.S. Attorneys