# AGNIFILO
# INTRATER

---

March 10, 2025

**VIA ECF**
Hon. Christine P. O'Hearn, U.S.D.J.
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Street
Camden, NJ 08101

      Re:    **United States v. Peter Coker, Jr. & Peter Coker, Sr.,**
              **Crim. No. 22-CR-643 (CPO)**

Dear Judge O'Hearn:

      Defendants Peter Coker, Jr. and Peter Coker Sr. submit this brief jointly to provide a road map for the Court's loss determination in this market manipulation case.  We want to be clear:  the Cokers have pled guilty, because they are guilty.  The Cokers accept full responsibility for their actions.  But part of the reason this case has taken so long to resolve is that the parties simply have a fundamental disagreement about the proper amount of loss under the Sentencing Guidelines.  Therefore, working in good faith, the parties signed plea agreements that permit disagreement about the loss amount.  The Court entered those pleas.  We thank the Court for permitting this procedure, because we just believe fundamentally that the Government is seeking to include amounts that are not cognizable as loss under black-letter law, under the facts of this case, and under the Guidelines.

## OVERVIEW

      The Government is seeking to include three "buckets" of loss in the Guidelines calculation: 1) Investments by retail investors; 2) Investments by endowment asset managers ("EAMs") connected to two universities; and 3) Fees paid to the defendants.

      But this is not correct.  As will be demonstrated below and at the loss hearing, only the first of these "buckets" can be counted as loss.  The Cokers admit to this loss.  This happened, and this why we are writing before a loss hearing, and not before a trial.  The second two buckets, however, are far different, and cannot be counted.

      This **first bucket** consists of the losses incurred by retail investors who purchased stock of the two subject companies at artificially inflated prices, whose investment decisions were affected by inaccurate information injected into the marketplace by the market manipulation, and whose losses can be attributed to their purchases of shares of these stocks at prices artificially inflated due to the manipulative trading.

      The parties agree that these losses amount to, at most, less than $250,000.  This would result in, at most, a 10-level enhancement for loss.  *See* USSG §2B1.1(b)(1)(F).

# AGNIFILO
# INTRATER

---

The **second bucket** consists of investments made by a hedge fund that managed money for investment companies associated with two universities' endowments (the "Endowment Asset Managers" or "EAMs").

But the EAM's investments were far different from those of the retail investors.

*One*, in contrast to the retail investors, the EAMs were not investing based on inaccurate information that had been injected into the marketplace by manipulative trading. They could not have, because the manipulative trading in this case happened only *months after* the EAMs' investments. Thus, any manipulation – any inaccurate information injected into the marketplace by the conspirators' trading – could not have been material to the EAMs' decision to invest; it could not have induced the EAMs to invest. Indeed, we anticipate that the loss hearing evidence will show that the EAMs did not control their investments at all – they outsourced that responsibility to Maso Capital, a hedge fund who autonomously managed the EAMs' funds.

*Two*, the structure and purpose of the EAMs' investments demonstrate that the EAMs *did not invest based on the share prices* of the subject securities as all. Rather, the EAMs, through Maso, made private placements in the subject companies, and these private placements could not be less like the investments of a regular retail investor: The EAMs: (a) Purchased at $1.00 per share (not the market price of the securities); (b) Received *20 warrants for every share* received; and (c) Were investing as part of their "alternative investments", that is, they were looking to profit not from share price increases, as with a typical equity investment, but rather they had a totally different purpose. Thus, any share price fluctuations were immaterial to the EAMs' investments – they were looking for, in their own words, a "SPAC-like" investment vehicle, which would pay off handsomely if and when it was merged with a private company. That was the value proposition for the EAMs, not a "buy low, sell high" proposition like for the retail investors.

*Three*, and independent of the first two points, the EAMs invested at a price that was not affected by the market manipulation (i.e., they did not invest at artificially-inflated prices). Even when a viral investment note was released, and the Indictment in this case was filed, the share price remained above the price the EAMs paid. Thus, the EAMs cannot be victims; there is no loss as to them connected to the manipulative trading. All changes to the stock prices subsequent to the publication of the investment note or of the Indictment cannot be attributed to the manipulative trading, because the chain of causation has been broken. Again, this is a completely independent reason why there is no loss, for Guidelines purposes, for the EAMs' investments.

The EAMs are therefore not victims, and their investments cannot be considered as losses under the Guidelines. This is true because of the timing of the EAMs' investments; the structure and the purposes of the EAMs' investments; and the share price at which the EAMs purchased their shares and warrants. Thus, the fraudulent conduct in this case – which, again, we

acknowledge – did not and, logically, could not have caused the EAMs to suffer any loss that can be linked to that fraudulent conduct.[1]

The **third bucket** of potential responsibility that the Government has identified are consulting fees that the Cokers earned in connection with the subject companies. But, as will be demonstrated, these fees cannot be considered as loss either. One, the Cokers did real work to earn all of these fees. The purpose of the Cokers' involvement in these two companies, particularly for Peter Sr., was to do what they had done previously, and completely lawfully – to find public companies with little business (known as "shell" companies), spend time and money cleaning those companies up, and "packaging" those companies so that they could merge with private companies seeking access to the public markets. In the event, this is exactly what happened here, and the Cokers' work on these companies made these results possible. Two, these fees cannot be considered as gain, because the Guidelines prohibit using gain unless the loss is not reasonably calculable – but here the Government says the loss is reasonably calculable. Three, if the Government is trying to consider the EAMs' investments as loss, then the consulting fees cannot also be loss, as the consulting fees derived from the EAMs' investments. In any of these scenarios, though, one thing remains the same – the consulting fees cannot be considered as "loss" under the Guidelines.

## BACKGROUND

Each of the Cokers has pleaded guilty to Counts One and Two of the Indictment, charging conspiracy to commit securities fraud and securities fraud, respectively. *See* ECF No. 1 at 1-24: *Indictment*; ECF No. 119: *Plea Agreement*. According to the allocution and the government's indictment, the fraudulent conduct included that Coker, Jr.'s concealment of his majority ownership of the subject companies by arranging for the sale or transfer of his shares to companies he controlled, beginning in March 2020. Then, in October 2020, a Form S-1 was filed that likewise concealed the majority ownership and control of the companies.

Primarily, though, the Cokers participated in a scheme to control and artificially influence the market price of the subject companies through coordinated trading activity, which was carried out by co-defendant James Patten. Critically, though, all of the evidence in the case shows that the coordinated trading only began in November 2020.

Months *before* the manipulative trading, in April 2020, the EAMs made a private placement investment into HWIN, the first subject company. The EAMs are asset managers, who invest money on behalf of the universities. As the Court will hear from witnesses at the hearing, the watchword of the universities' investment objective is *diversification*. To ensure steady

---

[1] Given the factual record, the government will also be unable to provide Your Honor with anything other than highly speculative estimates of loss, which is disallowed by binding Third Circuit precedent and inconsistent with U.S.S.G. §2B1.1 cmt. n.3(C), requiring a "reasonable estimate of . . . loss" based on available evidence.

returns, the EAMs use a broad array of investment strategies: they invest in domestic equities, and foreign equities, they invest in domestic bonds, and foreign bonds. They invest in derivatives. They invest in real estate. And they invest in "alternative" assets. But the EAMs don't just diversify in their strategies, they diversify in the asset managers – they invest through multiple different hedge funds for different strategies. Some of the hedge funds employed by the EAMs invest in different strategies themselves, allowing the EAMs diversification within diversification.

One of the "alternative asset managers" that the EAMs used was Maso Capital, a "Hong Kong based alternative asset manager with a focus on Asia." This is not plain-vanilla index fund investing: Maso claims to use an "opportunistic approach" "to invest across the capital structure to achieve consistent, risk-adjusted, asymmetric returns throughout market cycles." The EAMs did not, in other words, use Maso to invest in GE or Coca-Cola. Instead, the EAMs use Maso and others to provide further diversification – investments that will profit when certain "events" happen. That is, these investments were not made because the EAMs thought that the subject companies would increase their sales, or because dividends would be available to investors. Rather, the EAMs invested as an alternative investment, one made into a corporate shell, and were looking to profit from a SPAC-like reverse merger where a private company used that shell to gain access to the U.S. public markets.

For the companies involved in this case, Maso made the investments, not the EAMs, and Maso had the discretion to invest, not the EAMs. Indeed, the Prospectus for the underlying investments contained the following statements: Maso "has **sole voting and investment power** over the securities of the Company held by" the EAMs. Indeed, Maso's control was so complete that the Prospectus included a note that "Maso disclaim[s] beneficial ownership over the securities of the Company held by" the EAMs, since Maso was exercising such complete control that it could otherwise appear as though the shares actually belonged to Maso.

Unlike retail investors, the EAMs did not invest in the open market, by simply buying shares of the subject companies. Rather, through Maso, the EAMs participated through a "private placement." The EAMs did not invest at the "market price," as would a retain investor. Instead, the private placements were made at a price of just $1.00 per share. This was far below the market price at which the shares were then trading. Moreover, the shares purchased by the EAMs came with additional "warrants" per share. This means that the EAMs had the right to purchase 20 additional shares (for HWIN) and an additional 2 shares (for EWST) for every share the EAMs held. These warrants were obtainable at a fixed price of $1.00, regardless of the market price.

The manipulative trading began in or about November 2020. On April 16, 2021, about a year after Maso made the first investment on behalf of the EAMs, a high-profile American hedge fund manager, David Einhorn, published an investment note, which was then widely distributed and widely read. Einhorn's investment note expressed concern about HWIN's valuation given its minimal revenues and assets.[2]

---

[2] Qlet, Q1 2021 Letter, ValueWalk (Apr. 2021), https://www.valuewalk.com/wp-content/uploads/2021/04/Qlet2021-01-2.pdf. As of this date, it becomes impossible to determine

# AGNIFILO
# INTRATER

---

On September 3, 2021, the first "event" happened: EWST entered a reverse merger with EZ-Raider, a private company with offices in Isreal and the United States that sells four-wheel electric vehicles. And, notwithstanding Einhorn's publication calling into question HWIN's valuation, on April 1, 2022, HWIN entered a reverse merger with Makamer Holdings, Inc., a private company with offices in the United States operating in the bioplastics industry. These reverse mergers were made possible only because of the work that the Cokers, particularly Coker Sr., did to "clean up" the EWST and HWIN "shells," so that the private companies could take advantage of the shells' already-existing structure and merge themselves into the shells.

About a year after the first reverse merger, on September 22, 2022, the indictment was returned in this case, and the indictment was unsealed on October 11, 2022.

The government has never alleged that the financial health of either EZ-Raider or Makamer Holdings, Inc. was negatively impacted by the fraud scheme alleged in this matter. The current financial positions of either company, however, are unknown. The EAMs, to our knowledge, still retain ownership of their shares in HWIN and EWST and have made no attempt to sell their shares.

## ARGUMENT

Neither the EAMs private placements nor the consulting agreement fees are cognizable as loss.

Under the U.S. Sentencing Guidelines, the prosecution "has the burden of showing the amount of loss resulting from criminal conduct." *United States v. Tupone*, 442 F.3d 145, 156 (3d Cir. 2006). The "analytical goal" of "loss calculations under the Guidelines" is "quantifying the amount of 'harm' wrought against the victim … by a particular criminal act." *Id*. at 154. A person or entity is not a victim unless they sustain a loss as a result of the offense. *See* U.S.S.G. § 2B1.1(b)(1)(C)(i) (defining actual loss as "the reasonably foreseeable pecuniary harm *that resulted from the offense*" (emphasis added)) and app. note 1 (a victim is "any person who sustained any part of the actual loss").

Accordingly, the government must prove a "reasonable estimate" of "the amount of loss *resulting from* criminal conduct." *Id*. at 156 (emphasis added). *Tupone* reversed the District Court's Guidelines application, holding that the District Court erred by using the entire sum paid to the defendant rather than the loss resulting from a particular *fraudulent omission* made by the defendant that caused him to receive a *portion* of the total sum that he was not entitled to obtain. *Id*. ("The only loss that can be definitively shown on this record is the amount by which [defendant's] benefits would have been immediately reduced had he reported his car sale profits.").

---

what losses resulted from the manipulative trading, and what losses resulted from other factors, such as this negative publicity.

# AGNIFILO
# INTRATER

---

The Third Circuit does not mandate a particular analytical approach for isolating the loss caused by fraudulent conduct. *See United States v. Georgiou*, 777 F.3d 125, 146 (3d Cir. 2015). The Second Circuit, however, has articulated a set of useful and relevant principals designed to reduce the "impact of market forces" beyond a defendant's control from impermissibly inflating the loss figure—a figure that will ultimately serve as a proxy for the defendant's individual culpability for the offense. *Id*. This approach is discussed in *United States v. Rutkoske* and is an adaptation of the U.S. Supreme Court's approach for determining the appropriate loss amount in civil securities fraud matters. 506 F.3d 170 (2d Cir. 2007), *citing Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

The fundamental point is that "the loss must be the result of the fraud." *Rutkoske*, 506 F.3d at 179; *compare Tupone*, 442 F.3d at 154. In security fraud cases, this principle is particularly important because "many factors may cause a decline in share price between the time of the fraud and the revelation of the fraud" and thus "losses from causes other than the fraud must be excluded from the loss calculation." *Id.*; *accord United States v. Zolp*, 479 F.3d 715, 719-21 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005) (remanding securities fraud conviction for resentencing where district court "did not take into account the impact of extrinsic factors on [the at-issue security's] stock price decline.").

The Supreme Court and the Second Circuit rejected the "inflated purchase price theory of loss causation" which attempts to "establish loss causation simply by showing that the purchase price was inflated because of the defendants' misrepresentation." *Id*. This theory was rejected because, "although an artificially inflated price might cause an investor's loss when the investor sells his shares after the truth makes its way into the marketplace . . . other factors, such as changed economic conditions, might also contribute to a stock's decline in price . . . and a plaintiff must prove that the misrepresentation proximately caused the economic loss." *Id*.

This District's decision in *United States v. Schiff*, 538 F. Supp. 2d 818 (D.N.J. 2008) follows the same rationale. There, the court addressed whether share price declines can prove materiality in securities fraud. The court held that evidence of a stock price decline was not probative of materiality because the expert's event study failed to control for external confounding factors. *Id.* at 836 (cited with approval in *United States v. Ferguson,* 676 F.3d 260, 274-75 & n.11 (2d Cir. 2011) (stock-price-drop evidence inadmissible at trial without expert testimony excluding "confounding factors" in order to "estimate the extent of the [stock-price-] drop attributable to the [offense conduct]")).

*Shiff* concluded that "a drop in stock price, by itself, does not establish that the decline was caused by the revelation of an earlier misrepresentation." *Id.* at 835 (citing *Dura Phama, Inc. v. Broudo*, 544 U.S. 336, 343 (2005)). Other market events—including changed economic circumstances; changed investor expectations; the volatility of the stock price; national, local, industry, and company news; and competitors' activities, among other factors—all affect share prices. Therefore, event studies are required to "control[] for [these]

6

exogenous market, industry, and economy-wide effects." *Id.* at 835-37; *id.* at 834 ("[W]ithout an expert analysis of why a stock price dropped, the jury might improperly speculate that the stock price drop was a result of the criminal conduct charged in the case rather than other potential explanatory factors where multiple adverse events coincided temporally.").

There are several reasons why the EAMs are not victims here and did not sustain any loss.

### I. The EAMs Were Not Deceived by the Fraudulent Conduct – the Timing Does Not Work

First, the EAMs are not victims because they did not engage in any securities transactions as a result of the criminal conduct here, and therefore did not sustain a loss caused by the criminal conduct. *See Tupone*, 442 F.3d at 156.

Title 15, United States Code, § 78j states that "[i]t shall be unlawful for any person … [t]o use or employ, *in connection with* the purchase or sale of any security … , any manipulative or deceptive device" promulgated by the SEC (emphasis added).

In *GFL Advantage Fund, Ltd. v. Colkitt*, the Court of Appeals explained that "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." 272 F.3d 189, 204 (3d. Cir. 2001) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 72 (2006) (the alleged fraud must "coincide" with a securities transaction).

Here, the admitted manipulation had nothing to do with the EAMs decision to purchase any shares of the subject companies for the very simple reason that the EAMs purchased months before any such manipulation. The timing just does not work.[3] When the EAMs decided to invest, in April 2020, the start of the manipulative trading was still more than six months away. The share price was more than $5.00 per share. And nonetheless the EAMs invested at $1.00 per share (with warrants!). Their decision was not, and could not have been, based on manipulation a half-year in the future.

### II. The Structure and Purpose of the EAMs' Investments Show There is No Loss Based on the Fraudulent Conduct

---

[3] The only relevant conduct from the Indictment that could have happened before the EAMs investment was Mr. Coker, Jr.'s efforts to conceal his majority ownership by moving his shares to nominee entities. But this conduct had no material, quantifiable, or proven effect on the value of the subject company. *See Tupone*, 442 F.3d at 156 (prosecution has the burden of proof of making a "reasonable estimate" of loss based on the "available information in the record" (internal quotations and citation omitted)); U.S.S.G. § 2B1.1(b) ("pecuniary harm" is harm that is "readily measurable in money"). The first instances of manipulative trading that artificially inflated the share price of HWIN occurred in December 2020, 7 months *after* the EAMs' private placements and therefore did not affect the price they paid for their shares. Moreover, it is indisputable that Maso – and by extension the EAMs – were aware of Coker, Jr. moving his shares into the names of entities.

The EAMs did not pay artificially inflated prices for their shares, because their asset manager, Maso, directed their purchases through a private placement, where the share price was set at $1.00, and the EAMs received additional value in the form of warrants for each share they purchased.

The EAMs did not make the investment decisions here. Rather, the EAMs delegated that authority to Maso. In turn, Maso, on behalf of the EAMs, did not consider the share prices when making their private placements. Maso created, designed, and delivered the terms sheets for these private placements in both subject companies. The purpose of the investments was to fund the subject companies for approximately three years so that merger partners could be found and so that the mergers could be consummated.

The EAMs wanted to take advantage of the SPAC craze of 2020 and 2021. It was just one more kind of diversification for the EAMs. The EAMs sought to invest in a "SPAC-like" vehicle which would pay off if and when a reverse merger happened. The EAMs' upside would not come from an increase in share price because of the rise and fall of the underlying business's fundamentals. Instead, the Maso-directed investments of the EAMs' money were made to profit from "events," such as a merger.

In a SPAC, investors receive two classes of securities: common stock and warrants that allow them to buy shares in the future at a specified price. Again – this is exactly what the EAMs got: For HWIN, the EAMs received 1 share and 20 warrants for every unit of investment; and for EWST, 1 share and 2 warrants for every unit.

Warrants are a critical ingredient for SPAC sponsors and investors. Warrants provide additional upside to early investors and are incentives to subscribe. Thus, the greater the number of warrants issued, the higher the perceived risk of the SPAC. The existence of the warrants here is a critical fact because it indicates that the EAMs' purchase of HWIN shares was nothing like a typical equity investment.

A typical retail purchaser of Apple or Walmart does not have any option to purchase warrants in those companies – the transaction is simply X amount of cash for Y amount of shares. Here, the EAMs were receiving an additional, and different, type of security in addition to their equity shares. This, again, both differentiates the EAMs' investments from those of a typical equity investor who can be influenced by individual instances of manipulative trading and demonstrates that the EAMs' investments were not driven by the same thesis as those individual equity investors. Again, the value of these investments here was unrelated to share price and therefore not impacted by fluctuation in share price.

### III.     The Share Price Paid Proves No Loss for the EAMs

When Maso created the term sheets for the EAMs' private placement investments, the price of each share was set at $1.00 per unit of investment. Thus, the price that Maso paid for HWIN was well below any manipulated value, or any value inflated by the fraudulent conduct in this case.

Remember, too, that the EAMs' investments were valued at $1.00 per share with the legal right to purchase 20 (for HWIN) or 2 (for EWST) additional shares at $1.00 per share *regardless* of market price.

Based on publicly available data, the share price of the subject companies never fell below $1.00 while they were trading, even after the indictment in this case was unsealed and made known to the public.[4] Indeed, the shares held by the EAMs may still be worth more than $1.00 per share. This point, too, is important: the loss hearing will show that the EAMs still hold their investments in the subject companies, and, to our knowledge, have made no attempt to sell their shares in the subject companies. Therefore, any claimed "loss" on the investment in the subject companies remain unknown and speculative.

Finally, the estimate of loss must be reasonably determinable without the use of undue speculation and conjecture. *Tupone*, 442 F.3d at 156 (loss must be "based on the available information in the record."); *see also United States v. Willis*, 560 F.3d 1246, 1251 (11th Cir. 2009) ("[C]ourts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines."). On the available and anticipated record, we do not believe the government will be able to satisfy this standard.[5]

## IV. The Consulting Fees Cannot Constitute Loss

The consulting fees do not constitute losses under the Guidelines because the Cokers' consulting services were genuine and did not include material misrepresentations or omissions.

*First*, the Cokers' work for the subject companies was real. They were hired to "clean up" the companies and "package" them so that they could merge with private companies seeking access to the public markets. Emails and other documentary evidence reflect that the Cokers performed this work. They were in frequent communication with the companies' lawyers, bankers, accountants, and potential merger candidates; they ensured that the companies were compliant with the listing requirements for over-the-counter securities; they ensured that the companies made

---

[4] Hometown Int'l, Inc., YCharts, https://ycharts.com/companies/HWIN (last visited Mar. 3, 2025) (trading at over $2 per share the day the indictment was unsealed, October 11, 2022, and remained elevated over a dollar per share until the company was delisted). Alternatively, any declines below $1.00 per share could have had other causes, and at least, the Government has not proven any causality.

[5] The government's anticipated theory of loss seems to mirror a 'benefit of the bargain' theory of damages used in civil contract or fraud cases. The Guidelines, however, do not allow for loss estimates based on what a party hypothetically *would have done* absent misrepresentations. Loss must be limited to actual, quantifiable financial harm. *See United States v. Banks*, 55 F.4th 246, 250 (3d Cir. 2022) (rejecting speculative loss theories); *see also Tupone*, 442 F.3d at 154; *cf. Dura Pharmaceuticals*, 544 U.S. at 342 (holding that misrepresentation alone does not establish loss).

timely public filings required by the SEC; they raised funds; and they identified potential reverse-merger candidates. In part because of this work, the EAMs made substantial private placements in these companies. Simply put, the Cokers provided genuine value in exchange for the consulting fees.[6]

*Second*, the consulting services were not fraudulent because the Cokers did not make material misrepresentations or omissions in the course of their consulting work. Even assuming that the Cokers concealed their ownership interests (which is not at all clear, as Maso – the EAMs' agent – knew of the Cokers' ownership), this information was immaterial to both the companies and the EAMs. *See Neder v. United States*, 527 U.S. 1, 22 (1999) ("the well-settled meaning of 'fraud' require[s] a misrepresentation or concealment of material fact" (emphasis in original)).

An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "The determination of materiality requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." *Id.* at 236 (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Although the "reasonable shareholder" standard is objective, the reasonable shareholder is different across different industries and circumstances. *See United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (the "reasonable investor" standard varies "with the nature of the traders involved in the particular market").

Here, the Cokers' ownership interests were immaterial to the companies' other shareholders because the interests of all shareholders were aligned. Notwithstanding the Cokers' ownership interests, all shareholders, including the Cokers, stood to benefit from consultants who would clean up and package the companies to attract potential investors. The Cokers provided this value, and the other shareholders did indeed benefit from this work. Because the transaction was fair and beneficial, the other shareholders suffered no loss by paying the consulting fees.

*Third*, the Coker's ownership interests were also immaterial to the EAMs, which sought alternative investments where they could profit from the companies' future reverse mergers. Like other investors focused on events to drive their potential profits, the ownership interests of potential investments were immaterial to the EAMs, whose value was entirely derived from the companies' future transactions. *See Litvak*, 889 F.3d at 64 (individual traders' points of view were relevant in determining whether a misrepresentation was material where it was "within the parameters of thinking of reasonable investors in the particular market at issue"). Another point makes clear that the Cokers' ownership interests and consulting fees were irrelevant to the EAMs:

---

[6] The Government should not be allowed to try and pivot to allege that the consulting fees were somehow "gain" under the Guidelines. Gain can only be used if the loss cannot be reasonably estimated, and here, the Government's own position is that at least some losses can be reasonably estimable – they are the losses to the retail investors that can be tied properly to the manipulative conduct.

the EAMs never sold their shares, even though the share prices of the at-issue companies have remained above the EAMs' $1.00 purchase price since the fraud was exposed. If the Cokers' ownership interests or consulting fees mattered to the EAMs' investment decisions, they would have sold their shares for a profit after disclosure of the fraudulent conduct. The fact that they continue to hold their shares indicates that the value of their investments is wholly detached from the Cokers' conduct.[7]

## CONCLUSION

The government's burden at the loss hearing is to prove by a preponderance of the evidence that the Cokers' conduct caused the loss of the EAMs' funds, and that the consulting fees are somehow connected to the loss. For the reasons set forth above, and because of the evidence to be developed at the loss hearing, the Government cannot carry its burden here.

Respectfully submitted,

**WHIPPLE AZZARELLO, LLC**

By:   /s/ John A. Azzarello
      John A. Azzarello
      Adam M. Elewa

**AGNIFILO INTRATER LLP**

By:   /s/ Zach Intrater
      Marc Agnifilo
      Zach Intrater
      Daniela Manzi

Cc: Lauren Repole, AUSA (by ECF)
    Aaron Webman, AUSA (by ECF)

---

[7] For the reasons discussed above, neither the private placements nor the consulting fees are cognizable as loss. But even if the EAMs' investments could be considered loss, the consulting fees could not be separately considered loss, as the consulting fees came from the EAMs' investments. Therefore, including both the private placements and the consulting fees in the total loss amount, would be double counting. In other words, the consulting fees represent a theory, or means by which, the private placements were allegedly lost, and not a separate countable loss figure.

# AGNIFILO
# INTRATER

# AGNIFILO
# INTRATER